UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE ARDELL ALEXANDER,

                             Petitioner,                    Case No. 2:18-cv-10663
                                                                Hon. Mark A. Goldsmith

v.

DANIEL LESATZ,[1]

                             Respondent.
_____/

## OPINION & ORDER
## (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS

      George Ardell Alexander, ("Petitioner"), a Michigan prisoner, filed this action under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Wayne Circuit Court of first-degree felony murder, Mich. Comp. Laws § 750.316(b), and carjacking, Mich. Comp. Laws § 750.529a. Petitioner was sentenced as a fourth-time habitual felony offender to a controlling sentence of mandatory life-imprisonment for the murder conviction and a term of 40-to-60 years for the carjacking conviction.

      The petition raises five claims: (1) insufficient evidence was presented at trial to sustain Petitioner's convictions, (2) the prosecutor improperly elicited testimony from a police officer that Petitioner invoked his right to remain silent, (3) the trial court erroneously admitted evidence of an excited utterance made by Petitioner's sister, (4) Petitioner's right to confront witnesses was

---

[1] The proper respondent in a habeas case is the petitioner's custodian, which in the case of an incarcerated prisoner is the warden of the facility where he is incarcerated. See Rule 2(a), 28 U.S.C. § 2254. Therefore, the Court substitutes Warden Daniel LeSatz in the caption.

1

violated by the admission of a witness's preliminary examination testimony, and (5) the prosecutor committed misconduct by suggesting that Petitioner had committed an unidentified crime immediately prior to the instant offense.

The Court will deny the petition because Petitioner's claims are without merit or barred by his state court procedural default. The Court will also deny Petitioner a certificate of appealability, but it will grant permission to appeal in forma pauperis.

## I. BACKGROUND

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009):

> At approximately 1:30 a.m. on August 5, 2014, Robert Gibbs, Tracy Brown, Giovanni Porter, and Albert Johnson were sitting on Gibbs' porch at 9145 Oldtown Street, Detroit, Michigan. At that time, the group was planning to briefly leave Gibbs' residence and drive to a nearby liquor store to get more alcohol before the store closed at 2:00 a.m.
>
> Suddenly, Gibbs, Brown, and Porter saw defendant, who was wearing a brown jogging suit or track suit, sprint around the corner where Gibbs' house was located. Defendant continued to run and cut across Gibbs' yard. It appeared from defendant's clothing that he had been in a fight, as his white T-shirt was "not in place like a normal person" and it had spots of blood on it. Defendant repeatedly asked Johnson to drive him to the "the west side right now," but Johnson refused for money-related reasons and chastised defendant for "whooping and hollering in front of . . . [his] neighbor's home." However, defendant seemed very upset or afraid of something, and it appeared that he was "just trying to get away from that area for some reason[.]" When defendant continued to ask for a ride, Johnson told Gibbs, Brown, and Porter that they should go to the store without him while he tried to calm defendant down, expressing his belief that he could make defendant calm down by the time they returned.
>
> As defendant and Johnson walked toward Johnson's house, Gibbs, Brown, and Porter drove to the liquor store. The trip took approximately 15 minutes. When they returned to Gibbs' residence, they did not see defendant or Johnson. However, Gibbs, Brown, and Porter then heard defendant repeatedly yell, "[T]hey're trying to rob me," as he exited Johnson's house or porch and walked towards Johnson's truck, a burgundy F-150. The only people in the vicinity at that time were Gibbs,

2

Porter, and Brown, and they saw no one else come from the direction of Johnson's home or run away from the scene.

Defendant attempted to start Johnson's truck with the automatic car starter remote, while continuing to state that "they" were trying to rob him. He ultimately entered and started defendant's truck. This concerned Gibbs, Porter, and Brown because Johnson never let anyone hold his car keys unless he was present and never allowed anyone else to drive his truck.

Gibbs ran inside his house, grabbed an axe, and ran toward the truck—which, at that point, was backing down the driveway—in an attempt to prevent defendant from taking it. Defendant shifted the truck into drive while it was halfway in the street and halfway on the sidewalk and grass. He then attempted to run over Gibbs and Brown by driving toward them while revving the engine. Gibbs and Brown jumped out of the way, and defendant drove over the neighbor's grass and onto the street, turning onto the service drive and entering westbound I-94.

After defendant left, Gibbs and Brown saw Johnson lying on his porch steps and realized that he was dead. Gibbs saw a little bit of blood in Johnson's mouth and a small gash on the top of his head.

The police arrived several minutes later. Based on the condition of the porch and the front bedroom inside Johnson's residence, the police believed that "a struggle" had ensued on the porch and "a ruckus" had occurred in the bedroom. Several items and blood samples were collected and sent to the Michigan State Police Crime Laboratory for DNA testing.

Katrina Johnson lived next door to defendant's sister, Monica, on Ford Street on the west side of Detroit. In the early morning hours of August 5, 2014, she had just returned home from work when she "heard a big bang" that "almost sounded like a car crash." She looked out the window and saw a burgundy F-150 truck. The truck had driven into a hole in the street and struck a blue Suburban that was parked in front of the hole. Katrina then saw defendant, who was wearing a brown hooded jogging suit, exit the vehicle. Defendant walked between Katrina's house and the home of her other neighbor, Sunny Willingham, and attempted to jump over Willingham's gate. Defendant was unable to do so, and the gate "made a lot of noise." Next, defendant quickly walked in front of Katrina's house, going to his sister's house on the other side. As defendant walked by within inches of Katrina's open window, defendant and Katrina gestured in acknowledgement of each other.

At approximately 7:00 a.m., defendant's sister, Monica, knocked on Katrina's door. When Monica sat down with Katrina and Katrina's aunt, she immediately told them that "her brother had just killed someone[.]" When Katrina asked Monica if she was sure, Monica responded that "she was very sure" and provided the following description of the crime to Katrina:

> She said her brother was on the east side. She didn't give an exact location, [stating] that somebody that he was acquainted with he had murdered and took his vehicle and I said, well, what kind of vehicle was it? I saw your brother just a few hours ago. She said, it's a F-150, and I said, I saw him, you know, in the vehicle, which was prior, maybe four hours prior and she said, yeah, we had to pull the vehicle around the corner and I left the keys on the dashboard.

Additionally, Monica told Katrina that she had defendant's clothing in the shopping bag and she intended to wash the clothes. Katrina left while Monica was still at her house. Based on the information from Monica, Katrina first went to see if the F-150 was still parked in the same place that she had seen it on her street and discovered that it was not. It was parked one block away near the corner of LaBelle and LaSalle, as Monica had indicated. Katrina immediately went to the police to report her findings.

Later in the morning on August 5, 2014, defendant was arrested after he surrendered to the police. The arrest occurred after he emerged from 2446 Ford Street, Detroit Michigan, while wearing a brown track suit.

Dr. Chantel Njiwaji, a doctor of forensic pathology employed by the Wayne County Medical Examiner's Office, performed an autopsy on Johnson's body. She classified Johnson's death as a homicide and was able to determine that "[t]he cause of death was blunt chest trauma and manual strangulation," although either of those causes were sufficient on their own to cause Johnson's death. She could not determine which injury occurred first and identified a variety of injuries on the inside and outside of his body.

People v. Alexander, 2016 WL 3767486, at *1-3 (Mich. Ct. App. Jul. 14, 2016) (footnote omitted).

Following his trial, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His brief on appeal filed by his appellate counsel raised six claims, from which the narrower set of his habeas claims were derived. The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. Id.

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court. The court denied the application because it was not persuaded that the questions presented should be reviewed. People v. Alexander, 895 N.W.2d 187 (Mich. 2017) (Table).

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) quoting Williams, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (internal quotation omitted).

## III. ANALYSIS

**A. Sufficiency of the Evidence**

Petitioner's first claim asserts that insufficient evidence was presented at trial to support his convictions. He asserts that the prosecutor did not present any evidence indicating that he used force or the threat of violence to take the victim's car, a required element of the carjacking charge, and therefore also part of the predicate for the felony-murder charge. After reciting the controlling constitutional standard, the Michigan Court of Appeals rejected the claim on the merits:

> The only other element contested by defendant is the force or fear element. He argues that there was no evidence presented at trial that he used force or violence, or that he threatened Johnson with force or violence. He asserts, "Although there was evidence that [Johnson] was choked, this is no evidence that the two events were directly related." Contrary to defendant's claims, the prosecution presented clear evidence from which the jury could infer that defendant used force or violence to commit a larceny of Johnson's vehicle. See Nowack, 462 Mich. at 400.
>
> The record shows that Johnson underwent serious injury causing death, consisting of blunt chest trauma, manual strangulation, and blunt force injuries to his face. It is clear that these injuries occurred within minutes before defendant drove away in Johnson's car, as Gibbs, Brown, and Porter each testified that (1) they saw defendant walk with Johnson toward Johnson's house immediately before they left for the liquor store, (2) their trip to the liquor store only lasted 15-20 minutes, and (3) they saw defendant taking Johnson's truck with Johnson's car keys—and found Johnson dead on the porch—when they returned from the store. Additionally, there was evidence that a struggle occurred on Johnson's front porch, which was the location where Johnson's body was found and where defendant was last seen before entering Johnson's truck. Moreover, Gibbs, Porter, and Brown consistently testified that Johnson never let anyone drive his truck, never let anyone else hold his car keys unless he was present, and made "everybody" aware of that fact. Under these circumstances, the jury could reasonably infer that Johnson's injuries and death were a direct result of defendant's use of force or violence in order to take Johnson's truck, especially given the fact that Johnson never allowed anyone else to drive his truck. Further, defendant's sister, in an excited utterance, told Katrina when she arrived at Katrina's house at 7:00 a.m. the following morning that defendant told her that he had murdered an acquaintance and taken his F-150. Therefore, when viewed in the light most favorable to the prosecution, sufficient circumstantial evidence was presented at trial to support defendant's carjacking conviction. See Hardy, 494 Mich. at 444; Bennett, 290 Mich. App. at 472.

Alexander, 2016 WL 3767486, at *4-5.

The federal due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review - the factfinder at trial and the state court on appellate review - as long as those determinations are reasonable. Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009).

The Michigan Court of Appeals reasonably rejected this claim. Under Michigan law, the crime of carjacking is committed when a person uses force or the threat of violence against an operator, passenger, or person in lawful possession of a motor vehicle during the commission of a larceny of the vehicle. Mich. Comp. Laws § 750.529a. Here, the evidence presented at trial, viewed most favorably to the prosecution, indicated that Petitioner strangled and stabbed the victim prior to taking his truck. 1/29/2015 Tr., Ex. 8 to Rule 5 Filing, at 55 (Dkt. 10-8). The evidence also indicated that the victim suffered extensive blunt force trauma, including fractured ribs and a lacerated pericardium around the heart—injuries consistent with Petitioner stomping on the victim's chest. Id. at 55-56. These actions satisfied the "force or threat of violence" requirement. Furthermore, eyewitnesses who were with the victim prior to the incident testified that Petitioner repeatedly asked the victim to give him a ride, and that the victim refused. 2/4/2015 Tr., Ex. 10 to Rule 5 Filing, at 84 (Dkt. 10-10). When these witnesses returned from the party store, they found the victim dead on the porch steps after the victim drove away in his truck.

1/29/2015 Tr. at 123; 2/4/2015 Tr. at 23. This evidence strongly indicated that Petitioner used force against the victim during the course of committing a larceny of the vehicle. Although there were no witnesses present to see Petitioner strangle and stomp on the victim in an effort to steal the victim's truck, the presentation of direct evidence was unnecessary. Circumstantial evidence and inferences drawn from the evidence may be sufficient to sustain a conviction. See, e.g., United States v. Algee, 599 F.3d 506, 512 (6th Cir. 2010). Petitioner's first claim is therefore without merit.

**B. Use of Petitioner's Silence**

Petitioner next claims that the trial court erred in denying his motion for mistrial after the prosecutor elicited testimony from Detroit Police Investigator Charles Weaver that Petitioner could not provide any information to the officer after his arrest. The Michigan Court of Appeals rejected the claim as follows:

> Here, there is no dispute that defendant waived his Miranda rights and voluntarily spoke with Investigator Weaver for a period of time. Although he subsequently invoked his Fifth Amendment right to remain silent, this fact was never presented to the jury. Rather, Weaver only stated defendant "could not provide any information" about an incident that occurred at the crime scene. Weaver made no mention of defendant's subsequent invocation of his right to remain silent. Further, even if Weaver's statement did constitute a comment on defendant's silence, the prosecutor did not elicit the comment. Weaver, without any prompting, mentioned defendant's inability to provide information while Weaver described the course of his investigation. See Taylor, 245 Mich. App. at 304 ("Here, . . . the arresting officer's testimony regarding defendant's silence was unsolicited and provided no unique information regarding defendant's guilt or innocence.").
>
> In addition, the prosecutor's subsequent examination of Weaver clarified that (1) Weaver spoke with defendant following his arrest, (2) Weaver had advised defendant of his constitutional rights, (3) defendant indicated that he would speak with Weaver, (4) defendant stated that he could not remember doing anything at 9159 Oldtown, and (5) the "lengthy" interview ceased at some point after defendant denied remembering that he did anything at 9159 Oldtown. Again, through these statements, Weaver did not comment on defendant's invocation of his right to remain silent, and defendant's silence was not used as evidence of substantive guilt or impeachment.

Alexander, 2016 WL 3767486, at *6-7.

It is a violation of the Due Process clause of the Fourteenth Amendment for the prosecution to use a defendant's post-Miranda silence to impeach a defendant's exculpatory testimony. Doyle v. Ohio, 426 U.S. 610, 619 (1976). "Doyle bars the use against a criminal defendant of silence maintained after receipt of governmental assurances." Anderson v. Charles, 447 U.S. 404, 408 (1980). The Supreme Court's holding in Doyle, however, does not apply if a defendant waived his right to remain silent and instead agreed to make a statement. Anderson v. Charles, 447 U.S. 404, 408 (1980). Questioning and argument regarding such statements is permitted because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. Id.

When Weaver was initially asked about his investigation, he testified that he conducted an interview with Petitioner, but Petitioner "could not provide any information." 2/4/2015 Tr. at 202-203. Petitioner's counsel moved for a mistrial on the grounds that the testimony constituted a reference to Petitioner's silence. Then, outside the presence of the jury, Weaver explained that he had read Petitioner his Miranda warnings prior to questioning him, and that Petitioner waived his rights. Id. at 206. Weaver stopped questioning when Petitioner claimed not to remember anything about the incident and did not want to talk anymore. Id. at 206-207. The trial court denied the motion for mistrial and ruled that Weaver could testify about Petitioner' statement that he did not remember anything, but he could not testify about the request to stop the interrogation. Id. at 207-208. After the jury was recalled, Weaver testified that he read Petitioner his Miranda rights prior to questioning him, Petitioner waived his rights, Petitioner said he did not remember anything that occurred at the crime scene, and then the interview ceased. Id. at 210-211.

9

The trial court did not err in denying Petitioner's motion for a new trial. The prosecution did not use Petitioner's invocation of his right to silence against him. Petitioner chose to waive his rights and told police that he did not remember the incident. The prosecutor's question was not an improper reference to Petitioner's right to remain silent; it was instead proper under Anderson in light of Petitioner's decision to make a statement and claim that he had no memory of the incident. See Dye v. Hofbauer, 197 F. App'x 378, 386 (6th Cir. 2006). The claim is therefore without merit.

**C. Admission of Hearsay**

Petitioner's third claim asserts that Katrina Johnson was permitted to testify in violation of the Confrontation Clause regarding a statement made by Petitioner's sister, Monica, that Petitioner admitted to her that he killed someone. Petitioner asserted that the statement did not qualify as an excited utterance under Michigan Rule of Evidence 803(2) because too much time elapsed between his alleged statement to his sister and Monica's statement to her neighbor. The Michigan Court of Appeals found that the statement was properly admitted as an excited utterance. Alexander, 2016 WL 3767486, at *8-9.

The admission of the statement did not contravene clearly established Supreme Court law. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const., Am. VI; Pointer v. Texas, 380 U.S. 400, 403-405 (1965). The Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 59 (2004). In Davis v. Washington, 547 U.S, 813 (2006), the Supreme Court decided that the Confrontation Clause applied only to testimonial hearsay and not to non-testimonial hearsay. Id. at 823-824; see also Whorton v.

Bockting, 549 U.S. 406, 420 (2007); Giles v. California, 554 U.S. 353, 376 (2008) (reiterating that "only testimonial statements are excluded by the Confrontation Clause. Statements to friends and neighbors . . . and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules.").

The statement at issue here was not testimonial. It was a statement made by one neighbor to another, and therefore did not implicate Petitioner's confrontation rights. Moreover, whether the nontestimonial statement was properly admitted as an excited utterance is a question of state law only, and it cannot form a cognizable basis for granting federal habeas relief. See Johnson v. Renico, 314 F. Supp. 2d 700, 706 (E.D. Mich. 2004). The claim provides no basis for habeas relief.

**D. Admission of Preliminary Examination Testimony**

Petitioner's fourth claim asserts that the trial court violated his rights under the Confrontation Clause when it admitted the preliminary examination testimony of Latrice Neal. Unlike the previous statement, this one was certainly testimonial. Petitioner argues that the prosecutor did not exercise due diligence in attempting to locate Neal prior to trial, and the prior testimony was therefore inadmissible under Michigan Rule of Evidence 804(b)(1).

After reciting the controlling constitutional standard, the Michigan Court of Appeals outlined the efforts undertaken by police to locate the missing witness to support the trial court's conclusion that the prosecutor exercised due diligence:

> As the trial court concluded, the uncontested efforts in this case constitute due diligence. During the midtrial hearing, Investigator Weaver testified that Neal was transported by the police to the preliminary examination, at which time she indicated her reluctance to be a witness. Despite her stated reluctance, however, Weaver experienced no difficulty in securing her presence at the preliminary examination. Likewise, Weaver encountered no issues in locating her address and personally serving her with a subpoena, and she provided no indication that she intended to move away from her residence on Ford Street. Accordingly,

Investigator Weaver had no reason to believe that it would be difficult to secure her presence at trial. As such, this case is distinct from cases where the police and prosecution were aware that a witness may not appear at trial because he had known reasons to avoid police detection or incentives to go into hiding. Cf. Dye, 431 Mich. at 67-68, 76; People v. Watkins, 209 Mich. App. 1, 4 (1995) (noting that the record included no indication that the prosecution experienced difficulties in producing an unavailable witness for the defendant's first trial).

Although Investigator Weaver did not have any contact with Neal or her immediate family after the preliminary examination, only four months passed between August 21, 2014, the date of the preliminary examination, and the time at which Investigator Weaver received the first set of subpoenas for defendant's trial. Investigator Weaver testified that he continuously looked for Neal without any success from approximately December 15, 2014, through February 10, 2015.

In December 2014 and January 2014, Investigator Weaver visited Neal's former address on Ford Street approximately three times until he was informed by Monica, who lived below Neal, that Neal no longer lived in the upper flat. Monica was unable to provide any information regarding Neal's whereabouts. Although Weaver had a working phone number for Neal at the beginning of the case, it was no longer in service as he searched for her before trial.

Weaver then accessed Accurint and Talon, two computer databases that provide the names of family members, addresses, social security numbers, and phone numbers associated with an individual, in an attempt to locate Neal. Through his searches, he found two addresses associated with the name "Latrice Neal." When Weaver visited one of these addresses before trial, located on Glendale Street in Detroit, Michigan, he discovered that it was a vacant residence that had no windows, no doors, no occupants, and no working utilities. Police visited the second address, located in Auburn Hills, Michigan, on at least two occasions after January 12, 2015. When Investigator Weaver visited the residence himself, he left a subpoena and his contact information. He also called the phone number provided for the woman named Latrice Neal who lived there on multiple occasions. Ultimately, after receiving the assistance of the Auburn Hills police during trial, the prosecutor and Investigator Weaver confirmed that the "Latrice Neal" who lived at the Auburn Hills address was not the same Latrice Neal who previously lived on Ford Street in Detroit, as the women had different birthdates and social security numbers, and Weaver confirmed that they were different people after viewing a photograph provided by the Auburn Hills police.

During the course of the trial, Investigator Weaver performed "additional Accurint research," which produced two additional addresses in Detroit. Both locations were vacant lots.

The police successfully contacted Neal's mother, Gail Dent-Edwards, while she was at Henry Ford Hospital. Dent-Edwards did not provide any information

regarding Neal's location or any contact information, but she indicated that she would ask Neal to contact the police. Later, the police were unable to serve Dent-Edwards with a subpoena because she had been discharged, and the hospital would not provide her current address. Dent-Edwards did not answer the phone when the police attempted to call the number that she provided to Officer Patrick Lane, and Investigator Weaver was unable to determine Dent-Edwards' whereabouts.

When Weaver called another potential telephone number for Neal, there was no answer. However, when Officer Lane called, someone answered, stated that she was "Latrice Neal," but denied that she had lived at 2446 Ford. The woman also stated that she did not know defendant.

Weaver also was unable to locate a current address, photo, or any other helpful information concerning Neal through the Law Enforcement Information Network ("LEIN"). He contacted the Department of Agriculture to determine if Neal had been issued a bridge card and learned that she had, but it was registered to the vacant address on Glendale in Detroit. He also contacted the U.S. Postal Service, but he had not received a response at the time of the due diligence hearing. Moreover, Weaver also checked area hospitals and as well as jails and prisons in Oakland, Wayne, and Macomb Counties without success.

Alexander, 2016 WL 3767486, at *10-11.

The state court decision was reasonable. Prosecutors may seek to admit the preliminary examination testimony of a non-testifying witness where they made a good-faith effort to obtain the presence of the non-testifying witness at trial. Hamilton v. Morgan, 474 F.3d 854, 858 (6th Cir. 2007). "A good-faith effort . . . is not an ends-of-the-earth effort, and the lengths to which the prosecution must go to obtain a witness generally amount to a question of reasonableness." United States v. Cheung, 350 F. App'x 19, 23 (6th Cir. 2009) (internal quotation marks, citations, and alterations omitted). The lengths to which the prosecution must go to produce a witness, such that the admission of the prior confronted testimony at a subsequent trial does not violate the Confrontation Clause, boils down to a question of reasonableness. Hardy v. Cross, 565 U.S. 65, 70 (2011) (quoting Ohio v. Roberts, 448 U.S. 56, 74 (1980)). The Supreme Court noted that "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not

require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Id. at 71-72. Most importantly, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." Id. at 72.

Here, the Court agrees with the Michigan Court of Appeals that the prosecution and law enforcement made a good faith effort to bring Neal to trial based on a reasonable determination of the facts. As such, Petitioner is not entitled to relief on this claim.

### E. Prosecutorial Misconduct

Petitioner's final claim challenges the conduct of the prosecutor. He argues that his trial was rendered fundamentally unfair when the prosecutor elicited sympathy for the victim by stating that the victim was not present to testify what happened to him, and by suggesting without evidence that Petitioner arrived at the victim's house after having just committed another crime.

The Michigan Court of Appeals rejected the claim by finding that review was limited to whether "plain error" occurred due to Petitioner's failure to object in the trial court to the alleged misconduct. Alexander, 2016 WL 3767486, at *13. The court went on to find that Petitioner failed to establish entitlement to relief under that narrow standard. Id. at *14-15.

By finding that the claim was limited to "plain error" review, the Michigan Court of Appeals determined that Petitioner's claim was procedurally defaulted based on his failure to comply with Michigan's contemporaneous object rule, and that finding likewise bars habeas review absent a showing of "cause and prejudice." See, e.g., Lundgren v. Mitchell, 440 F.3d 754, 765 (6th Cir. 2006).

The only conceivable candidate for "cause" would be an argument that Petitioner's trial counsel was ineffective for failing to object to the allege misconduct. However, when a habeas

14

petitioner claims ineffective assistance of counsel as cause for a procedural default, the allegation is a separate claim which must itself be exhausted in state court according to the normal procedures. Edwards v. Carpenter, 529 U.S. 446, 452 (2000). The failure to exhaust the ineffectiveness claim will itself constitute a procedural default of the cause argument and prevents a federal court from hearing it. Id. Petitioner never exhausted a claim that his trial counsel was ineffective for failing to object to the alleged misconduct, and therefore he cannot demonstrate cause to excuse his default. Review of this claim is therefore barred.

As none of Petitioner's claims merit relief, the petition will be denied.

## IV. CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R.App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of Petitioner's claims because they are devoid of merit or barred from review. The Court will therefore deny a certificate of appealability.

If Petitioner chooses to appeal the Court's decision, however, he may proceed in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. CONCLUSION

Accordingly, the Court denies with prejudice the petition for a writ of habeas corpus, denies a certificate of appealability, and grants permission to appeal in forma pauperis.

SO ORDERED.

Dated: May 24, 2019  
    Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 24, 2019.

s/Karri Sandusky  
Case Manager